# Ethical Issues Raised by Retention and Use of Flight Privileges by FAA Employees

Although flight privileges generally do not require disqualification under 18 U.S.C. § 208 from all matters involving the relevant air carrier, a Federal Aviation Administration employee who holds such flight privileges must disqualify him or herself from particular matters where FAA action may have a direct and predictable effect on the relevant air carrier's ability to honor the employee's flight privileges.

An employee with flight privileges and the airline that provided them have a "covered relationship" that must be analyzed under an Office of Government Ethics regulation (5 C.F.R. § 2635.502) to determine whether the employee's participating in a matter involving that airline would create an "appearance problem." The regulation entrusts the agency and the employee to make that determination based on the facts of a particular case.

Although flight privileges could constitute a "payment" within the meaning of another OGE regulation (5 C.F.R. § 2635.503), and therefore must be analyzed under the regulation, they do not constitute an "extraordinary payment" under the described circumstances.

Flight privileges are not a type of interest that would qualify as "stock" or "any other securities interest" under a Department of Transportation regulation (5 C.F.R. § 6001.104(b)) that supplements the OGE impartiality regulations.

August 30, 2004

MEMORANDUM OPINION FOR THE DEPUTY CHIEF COUNSEL
FEDERAL AVIATION ADMINISTRATION

You have requested our opinion on four issues related to the retention and use of "flight privileges" by employees of the Federal Aviation Administration ("FAA").[1] Flight privileges are no-cost air travel privileges earned through former employment with an air carrier. We understand that flight privileges represent a common retirement benefit in the airline industry available to all retired airline employees meeting certain length-of-service requirements. We also understand that while an airline may eliminate or modify the flight privileges of all retirees, it may not do so on a case-by-case basis by refusing to honor the flight privileges of a particular retiree who otherwise satisfies the rules governing their use. We further understand that flight privileges cannot be sold or transferred.

*First*, you ask whether flight privileges are a disqualifying "financial interest" for FAA employees under 18 U.S.C. § 208 (2000), the criminal conflict of interest statute. We conclude that although flight privileges generally do not require disqualification under section 208 from all matters involving the relevant air carrier, an FAA employee who holds such flight privileges must disqualify him or

---

[1] Letter for Jack L. Goldsmith III, Assistant Attorney General, Office of Legal Counsel, from James W. Whitlow, Deputy Chief Counsel, Federal Aviation Administration (June 16, 2004). The Office of Government Ethics and the Criminal Division of the Department of Justice concur in this memorandum.

herself from particular matters where FAA action may have a direct and predictable effect on the relevant air carrier's ability to honor the employee's flight privileges.

*Second*, you ask whether flight privileges must be analyzed under 5 C.F.R. § 2635.502 (2003), an Office of Government Ethics ("OGE") regulation that under certain circumstances requires an employee to recuse him or herself if participating in a matter would create an "appearance problem." We conclude that an employee with flight privileges and the airline that provided them have a "covered relationship" that must be analyzed under the regulation to determine whether the employee's participating in a matter involving that airline would create an appearance problem. This Office, however, is not in a position to decide in the abstract for an agency or an employee whether there would be an appearance problem. Instead, the regulation entrusts the agency and the employee to make that determination based on the facts of a particular case.

*Third*, you ask whether flight privileges must be analyzed under 5 C.F.R. § 2635.503 (2003), an OGE regulation that generally prohibits a government employee from participating for two years in matters involving his former employer if the employee received an "extraordinary payment" prior to entering government service. We conclude that although flight privileges could constitute a "payment" within the meaning of the regulation, and therefore must be analyzed under the regulation, they do not constitute an "extraordinary payment" under the circumstances you have described.

*Fourth*, you ask whether flight privileges are a type of interest that would qualify as "stock" or "any other securities interest" under a Department of Transportation regulation that supplements the OGE impartiality regulations. *See* 5 C.F.R. § 6001.104(b) (2003). We conclude that they are not, as those terms are not naturally read to include benefits like flight privileges.

# I.

You first ask whether flight privileges are a disqualifying "financial interest" under 18 U.S.C. § 208(a), the criminal conflict of interest statute. Section 208(a) provides that

> [e]xcept as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a

> ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest . . . [s]hall be subject to the penalties set forth in section 216 of this title.

*Id.* Congress enacted section 208(a) in 1962 as part of a general revision of the conflict of interest laws. Pub. L. No. 87-849, sec. 1(a), § 208(a), 76 Stat. 1119, 1124 (1962).

In answering your question, we "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Qual. Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (internal quotation omitted). By prohibiting an executive branch officer or employee from participating "personally and substantially" in a "particular matter" "in which," "to his knowledge," he has a "financial interest," section 208 makes clear that, in order to be a disqualifying financial interest, an interest must be a "financial interest" "in" a matter. The question, then, is not whether flight privileges (or any other category of property or benefit) qualify as a financial interest per se, but whether the holding of flight privileges by an employee may constitute *a financial interest in a particular matter*. *Compare* 18 U.S.C. § 208(a) (2000) (requiring a determination whether an employee has a financial interest *in a matter*) *with* 18 U.S.C. § 434 (1958) (section 208(a)'s predecessor, requiring a determination whether an employee has an "interest[] in the pecuniary profits or contracts of any corporation . . . or other business entity"), 5 C.F.R. § 6001.104(b) (requiring a determination whether an employee has a "securities interest in an airline"), *and* 5 C.F.R. § 6001.104(a) (requiring a determination whether an employee has "a financial interest . . . in a railroad company").[2]

While the statute does not define what it means to have a "financial interest" "in" a governmental matter, or what kinds of property or possessions can give rise to a financial interest in a matter, these words have an ordinary meaning and usage. As generally understood, a "financial interest" is an interest "pertaining to monetary receipts and expenditures." *Random House Dictionary of the English Language* 532 (1971); *see also Black's Law Dictionary* 816 (7th ed. 1999) ("inter-

---

[2] *See* Roswell B. Perkins, *The New Federal Conflict-of-Interest Law*, 76 Harv. L. Rev. 1113, 1131 (1963) (noting that section 434 "was limited to situations where the government employee had one of two basic types of interest in the private party, *i.e.*, the 'business entity,' involved in the governmental proceeding," while section 208(a) "requires that there be a 'financial interest' on the part of someone in the particular government proceeding").

est" means "[a]dvantage or profit, esp. of a financial nature"). And by everyday standards of language, one has a financial interest in a governmental matter only when the particular matter can affect one's finances—i.e., one's monetary receipts and expenditures.

The ordinary understanding of these words also accords with the OGE's regulatory interpretation of section 208. Exercising its authority to "promulgat[e], with the concurrence of the Attorney General, regulations interpreting the provisions of . . . section 208," Exec. Order No. 12674, § 201(c), 3 C.F.R. 215, 216 (1989), the OGE has interpreted the term "financial interest" to mean "the potential for gain or loss to the employee, or other person specified in section 208, as a result of governmental action on the particular matter." 5 C.F.R. § 2640.103(b) (2003). "[A] disqualifying financial interest" in a matter, then, "might arise from ownership of certain financial instruments or investments such as stock, bonds, mutual funds, or real estate." However, "a disqualifying financial interest" might also "derive from a salary, indebtedness, job offer, or any similar interest that may be affected by the matter." *Id.*

The OGE regulations also amplify what it means for a matter to "affect" an employee's finances. To constitute a disqualifying financial interest in a matter, the OGE regulations explain, a governmental matter must have more than a mere potential to affect the employee financially; rather, there must be "a direct and predictable effect." 5 C.F.R. § 2635.402(a) (2003); *id.* § 2640.103(a) (same). The "direct and predictable effect" requirement reflects the longstanding view of this Office, as well. *See Advisory Committees—Food and Drug Administration—Conflicts of Interest (18 U.S.C. § 208)*, 2 Op. O.L.C. 151, 155 (1978); Memorandum for the Heads of Executive Departments and Agencies from the President, 28 Fed. Reg. 4539, 4543 (May 7, 1963).

These principles find straightforward application here. As a general matter, flight privileges will not require blanket disqualification under section 208 from all matters involving or affecting the air carrier that conferred the privileges. While their value to the employee may fluctuate as airfares rise and fall, flight privileges, we understand, do not fluctuate in value with the sponsor's business prospects. They cannot be sold or transferred, they do not trade on a market, they possess no resale value, and, indeed, they cannot be liquidated. Rather, the value to an employee of flight privileges is a simple function of the airline's ability to honor them. Many, if not most, FAA matters relating to the air carrier would likely have no direct and predictable effect on the airline's ability to honor an employee's flight privileges and would likely not financially affect the employee's interests within the meaning of the statute.

It may be the case, however, that certain, perhaps extraordinary, FAA matters may create a disqualifying financial interest for an employee on account of flight privileges. Where an FAA matter, for example, has the clear potential to result in the airline's losing its operating certificate, losing its right to fly, and thereby losing the ability to honor flight privileges, an employee who holds flight privileg-

es on that airline and who participates personally and substantially in that particular matter would have a financial interest in it. As flight privileges enable the holder to fly for free where non-holders must pay money, a prospective loss of flight privileges would "pertain to monetary . . . expenditures" and entail "the potential for" a monetary "loss to the employee."[3] Thus, we cannot categorically exclude the possibility that a financial interest in a particular matter can derive from flight privileges, although we can conclude that it would involve extraordinary circumstances. *Cf.* 5 C.F.R. § 2640.203(e) & ex. 1 (suggesting that participation in a "frequent flier program" can give rise to a disqualifying financial interest where a particular matter would have a direct and predictable effect on the employee's interest, but providing a regulatory exemption for participation in such a program so long as the program is open to the general public and participation involves no other financial interest).[4]

The law's current treatment of defined benefit plans reinforces this conclusion. In September 1995, the OGE published a proposed regulation that contains an interpretation of section 208. 60 Fed. Reg. 47,208 (Sept. 11, 1995). The preamble to that proposed regulation, which this Office reviewed and approved, states that a defined benefit plan ordinarily will not give rise to a financial interest, because

> [a]s a practical matter . . . most governmental matters in which an employee would participate are unlikely to have a direct and predictable effect on the plan sponsor's ability or willingness to pay an employee's pension benefits. Accordingly, most employees will not have a disqualifying financial interest in either the holdings or the sponsor of a defined benefit plan.

---

[3] We do not mean to suggest that only matters that have the potential to render an airline unable to honor *all* flight privileges can create a disqualifying financial interest. A matter affecting an airline's ability to honor *some part* of an employee's flight privileges might also entail the potential for a monetary loss to the employee. For example, where an FAA employee regularly flies to a particular destination using flight privileges and a particular matter has the clear potential to affect the airline's ability to honor flight privileges to that destination (a result that would require the employee to pay to fly to a destination to which he regularly flies for free), the employee would likely have a disqualifying financial interest.

[4] One might argue that flight privileges can never give rise to a *financial* interest because they are not a financial instrument (e.g., cash, stocks, bonds or mutual funds) or an investment vehicle (e.g., real estate). That argument, however, would have a faulty premise, as the question is not whether *flight privileges are financial*, but whether the *employee's interest in a governmental matter is financial*. Thus, it is well-established that a financial interest in a matter may derive from a job offer or a law firm's representation of a client, neither of which resembles financial instruments or investment vehicles, and yet both of which can give rise to a disqualifying financial interest in a governmental matter. *See* 5 C.F.R. § 2640.103(b) ("a disqualifying financial interest might derive from a salary . . . [or] job offer"); Memorandum for Arnold I. Burns, Deputy Attorney General, from Margaret C. Love, Special Counsel, Office of Legal Counsel, *Re: Waiver Under 18 U.S.C. 208(b)(1)* (Mar. 14, 1988) (law firm's interest in litigation in which it is involved in a representative capacity may give rise to a financial interest that may be imputed to a government employee who has accepted a position with the firm).

*Id.* at 47,214; *see also* 5 C.F.R. pt. 2640 (final rule); Memorandum for Stephen D. Potts, Director, Office of Government Ethics, from Richard L. Shiffrin, Office of Legal Counsel (Sept. 17, 1996) (concurring in publication of final rule); Office of Government Ethics, *18 U.S.C. § 208 and Defined Benefit Pension Plans*, Informal Advisory Op. 99x6, at 3 (Apr. 14, 1999), *available at* http://www.oge.gov/OGE-Advisories/Legal-Advisories/Legal-Advisories (last visited May 24, 2013) ("*Defined Benefit Pension Plans*") ("If an employee is assigned to participate in a particular matter that affects the sponsor of his defined benefit plan, the employee will not ordinarily have a disqualifying financial interest in his defined benefit plan under section 208, unless the matter would have a direct and predictable effect on the sponsor's ability or willingness to pay the employee's pension benefit."); *id.* at 3 ("If [a matter] could result in the dissolution of the sponsor organization and in its subsequent inability to pay the employee's pension, the employee's interest in his pension would be a disqualifying financial interest under section 208."); *id.* at 2; *cf. President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 190 (1981) (concluding that it would not violate the terms or spirit of Article II, Section 1, Clause 7 of the Constitution—which prohibits the President from receiving an emolument from a State while in office—for the President to receive a "pension in which he acquired a vested right six years before he became President, for which he no longer has to perform any services, and of which the State of California cannot deprive him").

As you have described them, flight privileges resemble a "defined" benefit in the sense that matters here. Like the benefit provided under a defined benefit plan, the value of flight privileges does not generally fluctuate depending on the FAA's regulatory treatment of the airline. Their value to the employee will, of course, be independently affected by the market price of air travel, just as the value of a defined benefit will rise or fall depending on the market performance of the benefit plan's investments. But the right to realize that value is definite, subject only to the company's ability to honor the privilege, just as a pension providing a defined benefit is definite, subject only to the company's ability to honor its funding obligations. If defined benefit plans do not ordinarily give rise to a disqualifying financial interest in the plan's sponsor, we have no reason to conclude that flight privileges will either.

The legislative history of section 208(a) offers further support for this conclusion. While Congress undoubtedly sought to reach genuine conflicts of interest in enacting section 208, nothing in the legislative history of section 208 suggests that Congress intended categorically to prevent government employees from participating in matters involving companies from which they receive retirement benefits. To the contrary, Congress was well aware that "legal protections against conflicts of interest must be so designed as not unnecessarily or unreasonably to impede the recruitment and retention by the Government of those men and women who are most qualified to serve it." H.R. Rep. No. 87-748, at 6 (1961). Our conclusion—

that flight privileges normally will not give rise to a disqualifying financial interest in an FAA matter—fully effectuates this intention.

A 1978 opinion of this Office on pension and welfare benefits does not alter our conclusion. In that opinion, we concluded that a government employee who continued to receive payments pursuant to the retirement program of his former law firm had a "financial interest" under section 208 in a matter in which the law firm represented a party. Memorandum for Barbara Allen Babcock, Assistant Attorney General, Civil Division, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Potential Conflict Presented by the Participation of Stephen J. Friedman on the Settlement Policy Committee* (Feb. 3, 1978). We interpreted section 208 to require disqualification in "any matter affecting a former employer whenever the Government official is continuing to participate in a welfare or benefit plan maintained by that employer, whether or not the employer continues to make contributions—unless the official first obtains an exemption pursuant to § 208(b)." *Id.* at 9 (footnote omitted). The 1978 opinion was based on the erroneous view that section 208(a) "requires that we look to more than merely the eventual financial impact the governmental matter may have on the employee." *Id.* at 6. "It is appropriate," we reasoned, "to consider as well the financial nexus the employee has with an entity that may be affected by the governmental matter, *even if the nexus is such that the financial impact on the entity will not be passed through to the individual employee.*" *Id.* (emphasis added). The 1978 opinion is inconsistent with the direct and predictable effect requirement subsequently adopted by OGE in its regulations and long approved by this Office. It is also inconsistent with the language of section 208 itself, which clearly requires disqualification only where a decision in the "particular matter" at issue has the potential to affect the individual employee's financial interests. For these reasons, we are constrained to repudiate our 1978 opinion.

## II.

You next ask whether flight privileges constitute an interest that must be analyzed under an OGE regulation, 5 C.F.R. § 2635.502(a) (2003). That regulation states that

> [w]here an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agen-

cy designee of the appearance problem and received authorization from the agency designee.

*Id.* Under section 2635.502(a), as relevant here, an employee's circumstances must satisfy two elements before the regulation counsels the employee either to decline to work on the matter or to obtain authorization from the agency designee: (1) the employee must know that a person with whom he has a covered relationship is a party or a party's representative in a particular matter, and (2) the employee or his agency must determine that a reasonable person would question his impartiality if he participates in that matter.[5]

In our view, an employee who holds flight privileges and the airline that provided the flight privileges would have a "covered relationship." According to the regulation, "[a]n employee has a *covered relationship* with," among other people, "(i) [a] person . . . with whom the employee has . . . a business, contractual or other financial relationship that involves other than a routine consumer transaction . . . [and] (iv) [a]ny person for whom the employee has, within the last year, served as officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee . . . ." 5 C.F.R. § 2635.502(b) (emphasis added). A flight privileges arrangement would qualify as a "contractual . . . relationship" under section 2635.502(b)(i), because we understand that flight privileges are granted under a contract or a benefit plan, or are otherwise subject to contractual terms. As that relationship would involve "other than a routine consumer transaction"—airlines, after all, do not routinely offer consumers free flight privileges—the FAA employee who holds flight privileges and the airline that provided them would have a "covered relationship" within the meaning of the regulation.

The OGE's informal guidance in this area further supports this construction of the regulation. OGE has stated that "[u]nder 5 C.F.R. § 2635.502(b)(1)(i), . . . [a] vested interest in a defined benefit plan funded and maintained by a former employer *would* create a covered relationship," an interpretation that applies with equal force to flight privileges. *Defined Benefit Pension Plans* at 3 n.3 (emphasis added); *cf. Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (an agency's interpretation of its own regulations is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation").

Whether flight privileges would create an appearance problem, satisfying the second element of the regulation, is not a question we can answer in the abstract. As OGE has advised, "OGE is not in a position to decide for an agency whether a reasonable person would question the impartiality of [an] employee's participation in a particular matter." Office of Government Ethics, *Receipt of Outside Awards*

---

[5] Although the first element is also satisfied if the employee knows that the particular matter is likely to have a direct and predictable effect on the financial interest of a member of his household, the analysis of that alternative would largely overlap our analysis of the criminal conflict of interest statute in Part I above.

*by Employees and Outside Activities by Employees*, Informal Advisory Op. 00x4, at 4 (Apr. 11, 2000), *available at* http://www.oge.gov/OGE-Advisories/Legal-Advisories/Legal-Advisories (last visited May 24, 2013). The same generally holds for this Office; the question of an appearance problem is best left to the employee and the agency based on the facts of a particular case. *See id.*; Office of Government Ethics, *Covered Relationship With Private Partner*, Informal Advisory Op. 93x25, at 2 (Oct. 1, 1993), *available at* http://www.oge.gov/OGE-Advisories/Legal-Advisories/Legal-Advisories (last visited May 24, 2013).[6]

## III.

You also ask whether flight privileges are an interest that must be analyzed under 5 C.F.R. § 2635.503 (2003), an OGE regulation that generally prohibits a government employee from participating, for two years, in matters involving his former employer if the employee received an extraordinary payment from that employer prior to entering government service. An "extraordinary payment" is

> any item, including cash or an investment interest, with a value in excess of $10,000, which is paid:
>
> (i) On the basis of a determination made after it became known to the former employer that the individual was being considered for or had accepted a Government position; and
>
> (ii) Other than pursuant to the former employer's established compensation, partnership, or benefits program. A compensation, partnership, or benefits program will be deemed an established program if it is contained in bylaws, a contract or other written form, or if there is a history of similar payments made to others not entering into Federal service.

*Id.* § 2635.503(b)(1).

Under the plain terms of the regulation, flight privileges can be a prohibited type of "payment." While the term "payment" ordinarily suggests money or some

---

[6] We note that under the OGE regulations an agency need not wait for an employee to determine whether a covered relationship would cause a reasonable person to question his impartiality. Section 2635.502(c) says that "the agency designee may make an independent determination" about impartiality "*at any time*" and "on his own initiative." 5 C.F.R. § 2635.502(c) (emphasis added).

Some might argue that an appearance problem could arise if a high percentage of FAA employees held privileges not generally available to the public from the industry regulated by the FAA, but we do not address the possible collective effect that widespread flight benefits among FAA employees might be perceived to have. The legal standards discussed in this memorandum turn on analysis of individual employees' personal interests, and there is no concept in the applicable laws of an "agency conflict of interest." Any effect that might be perceived because of the aggregation or widespread holding of individuals' financial interests is an issue for policy makers to consider.

other financial instrument, it also encompasses "compensation." *Webster's Third New Int'l Dictionary of the English Language Unabridged* 1659 (2002) ("payment . . . : the act of paying or giving compensation . . ."). And there is no reason that an airline employee could not be compensated with flight privileges. Moreover, the regulation states that "*any item . . .* with a value in excess of $10,000" may constitute an extraordinary payment, not just cash or financial instruments. Thus, it is the value, timing and extraordinary nature of a "payment" that brings the payment within the regulation's orbit, not its form. Granting privileges—whether flight privileges, country club privileges, or any other valuable privileges—as a reward for accepting a government position would pose no less of an impartiality problem than making an equivalent cash payment.

While flight privileges can qualify as a type of *payment*, and therefore must be analyzed under the regulation, we conclude that retiree flight privileges do not meet the regulation's definition of *extraordinary* payment. *First*, we understand that flight privileges are an *ordinary* benefit within the industry, not one awarded "on the basis of a determination made after" a former employer learns that an individual may enter government service. We are told that the FAA has sought our opinion in part because uncertainty about the ethical implications of flight privileges has impeded the FAA's ability to recruit former airline industry employees who are already entitled to such privileges and are free to use them if they choose not to enter government service. *Second*, flight privileges are earned under an "established . . . benefits program," 5 C.F.R. § 2635.503(b)(1)(ii), because, according to your letter, there is a history of granting them to retiring airline employees who are not entering federal service. *See also* 57 Fed. Reg. 35,006, 35,028 (Aug. 7, 1992) (OGE rejecting a proposal to define "extraordinary payment" to include payments made under an employment contract or employee benefits plan).[7]

## IV.

Lastly, you ask whether flight privileges qualify as "stock" or "any other securities" within the meaning of 5 C.F.R. § 6001.104(b) (2003), which forbids FAA employees, their spouses and their minor children to "hold stock or have any other securities interest in an airline."

Under any conventional standard of meaning, flight privileges do not qualify as "stock or . . . any other securities interest." "Stock" represents an equity interest in a company, while flight privileges entail no such ownership interest, but merely the privilege of flying for free. Nor do flight privileges qualify as "any other

---

[7] For the same reason, an FAA employee's use of flight privileges that were earned by virtue of prior employment with the airline and that are available to all similarly situated retirees pursuant to the general retirement benefit policy of the airline, regardless of subsequent government employment, would not constitute a "gift" prohibited by the ethics rules. *See* 5 C.F.R. § 2635.203(b)(6) (2003).

securities interest," as they are not an investment of any kind—either in form or in economic substance. *See* Securities Act of 1933, Pub. L. No. 73-22, § 2(1), *as amended*, 15 U.S.C. § 77b(a)(1) (2000) ("The term 'security' means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."); *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (explaining that under "[t]he test for whether a particular scheme is an investment contract," and therefore is a "security," "[w]e look to 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others'") (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)); *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 553 (1979) (holding that a non-contributory, mandatory pension plan did not constitute a "security" under the Securities Act of 1933 or the Securities Exchange Act of 1934 because there was no "investment of money"); *id.* at 559–60 ("In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security.").

Context bolsters this conclusion. A different section of the regulation, section 6001.104(a), provides that no Federal Railroad Administration ("FRA") employee may "hold stock or have any other *financial* interest, including outside employment, in a railroad company." 5 C.F.R. § 6001.104(a) (emphasis added). By broadly prohibiting FRA employees from holding any *financial* interest in a railroad, while narrowly prohibiting FAA employees from holding any *securities* interest in an airline, the regulation confirms that the FAA limitation incorporates only a narrow subset of financial interests and that it excludes non-securities interests like flight privileges.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
